764 P.2d 1131

SCOTTSDALE PUBLISHING, INC., an Arizona corporation, Jonathan and Maxine Marshall, and Don Devereux and Niomi Devereux, Petitioners,

v.

SUPERIOR COURT OF the State of Arizona, In and For the COUNTY OF MARICOPA, Honorable Marilyn A. Riddel, a judge thereof, Respondent Judge,

Roy ROMANO, Real Party in Interest.

No. 1 CA–SA 178.

Court of Appeals of Arizona, Division 1, Department D.

June 7, 1988.

Review Denied Dec. 6, 1988.

Brown & Bain, P.A. by Paul F. Eckstein, David J. Bodney, and Daniel C. Barr, Phoenix, for petitioners.

Marton & Hall, P.A. by Kraig J. Marton and Sarah J. Odneal, Phoenix, for real party in interest.

## OPINION

FIDEL, Judge.

Roy Romano, a publicly self-acknowledged former hoodlum and organized crime enforcer, sues Scottsdale Publishing, Inc., the owner of the Scottsdale Progress, for damaging his reputation by linking him to the Don Bolles bombing in a series of newspaper articles in the summer of 1984. He also sues Jonathan Marshall, the Progress publisher, who wrote one of the articles, Don Devereux, the reporter who wrote two of the articles, and the spouses of both men.[1] Romano seeks compensatory and punitive damages.

■ The Progress unsuccessfully moved for summary judgment. The trial court denied its motion and instead granted partial summary judgment for Romano, declaring Romano a private figure, who had only to prove *negligent* defamatory publication to win compensatory damages.[2] The Progress now asks by petition for special action that we reverse the trial court's decision and direct summary judgment in its favor against the entirety of Romano's claim or, alternatively, against his claim for punitive damages.

First, the Progress argues that the trial court erroneously declared Romano a private figure. Romano, the Progress points out, had stepped onto the public stage in the fall of 1983, when, in return for immunity from prosecution, he "turned state's evidence" against Joseph Tocco and gave detailed testimony about his own criminal activities as a member of the Tocco

---

1. We refer to the defendants collectively as the Progress.

2. Although the parties dispute whether Romano is a "private" or "public figure" as those terms are defined in libel law, they do not dispute that the Progress publications addressed matters of public concern. Where a media defendant has libeled a *private* individual while addressing matters of *public* concern, the private individual may recover compensatory damages upon a showing that the media defendant was negligent in publishing the defamatory falsehood. *Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 481, 724 P.2d 562, 567 (1986).

**74**

"gang." By this testimony, the Progress argues, Romano became a public figure, subject to expansive journalistic scrutiny and comment on his criminal past; concomitantly, he relinquished the right to sue for *negligent* falsehoods emerging from such scrutiny and retained only the right to recover for *knowing or reckless* defamatory falsehoods. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 724 P.2d 562 (1986). Romano, the Progress urges, failed to come forward with clear and convincing evidence of knowing or reckless defamation and thus should face complete dismissal of his suit.

Second, the Progress urges this court to adopt the "libel-proof plaintiff doctrine," heretofore unapplied in Arizona, and to conclude that the trial court erred in failing to hold as a matter of law that Romano's reputation was so poor before the Progress publications that he was incapable of being defamed. *See, e.g.,* Note, *The Libel-Proof Plaintiff Doctrine,* 98 Harv.L.Rev. 1909 (1985); *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298 (2d Cir.1986) *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987); for criticism of the doctrine, see also *Liberty Lobby v. Anderson,* 746 F.2d 1563 (D.C.Cir.1984), *rev'd on other grounds,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Finally, the Progress argues that Romano failed to meet its motion for summary judgment with any evidence to support his punitive damage claim. In the absence of evidence that it acted with "actual malice", *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), or an "evil mind", *Gurule v. Illinois Mut. Life Cas. & Co.,* 152 Ariz. 600, 734 P.2d 85 (1987), the Progress claims entitlement to partial summary judgment on the issue of punitive damages, even if Romano's compensatory damage claim survives.

We accept the first of the Progress arguments. We hold that Romano had become a public figure before the publication of the Progress articles, that he had opened questions of his criminal conduct to journalistic scrutiny and public concern, and that the Progress articles fell within that area of public concern. We further find no basis in Romano's evidence for the inference that the Progress knowingly published falsehoods about Romano. Nor do we find any basis for the inference that the Progress "entertained serious doubts as to the truth of [its] publications" and proceeded in reckless or conscious disregard of such doubts. *St. Amant v. Thompson,* 390 U.S. 727, 731-2, 88 S.Ct. 1323, 1325-6, 20 L.Ed.2d 262, 267-8 (1968); *Dombey,* 150 Ariz. at 487, 724 P.2d at 573. Because these holdings result in the complete dismissal of Romano's claim, we need not separately consider the punitive damage portion of that claim. Nor need we reach the second argument of the Progress and determine whether the "libel-proof plaintiff doctrine" should be adopted into Arizona law.

### I. *Special Action Jurisdiction*

Before outlining the facts and explaining our holding, we explain our reason for taking jurisdiction.

Review by special action of a trial court's denial of summary judgment is a rarity and shall remain so. We have discouraged even the filing of such petitions in the past and shall continue to do so. *See United States v. Superior Court,* 144 Ariz. 265, 269, 697 P.2d 658, 662 (1985). We make an exception in this case in furtherance of the public's significant first amendment interest in protecting the press from the chill of meritless libel actions. *See, e.g., Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966); *Schiavone Constr. Co. v. Time, Inc.,* 619 F.Supp. 684, 686 (D.N.J.1985).

The absence of merit in plaintiff's case is plain. By taking jurisdiction at this stage, we relieve the parties and the court of a prolonged, costly, and inevitably futile trial; additionally, and more significantly, we relieve the Progress of a potential chilling of its future reporting on activities of organized crime.

## II. *Was Romano a Public Figure*

The first amendment has been interpreted since *New York Times v. Sullivan* to extend journalists a wider margin of error in reporting about public figures than in reporting about private figures. In a libel action arising from a publication addressing a matter of public concern, a private figure may recover compensatory damages upon proof by preponderant evidence that he has been negligently defamed. *Dombey*, 150 Ariz. at 481, 724 P.2d at 567. A public figure, by contrast, "may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 807 (1974).

Proving knowledge of falsity or reckless disregard for truth is defined in legal shorthand as proving "actual malice."[3] *New York Times v. Sullivan*, 376 U.S. at 279, 280, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

We determine in this section that Romano must be held to the burden of proving actual malice. We proceed first by examining the three allegedly defamatory publications by the Progress, next by examining Romano's pre-Progress exposure to public scrutiny, and last by analyzing Romano's status as a public figure.

### A. The Allegedly Defamatory Publications

#### 1. *The June 22 Article:*

On June 22, 1984, the Progress published an article by Don Devereux entitled "Mob figure accused of Bolles bombing." The subject of the article was Roy Romano, who had surfaced in the public eye in the fall of 1983, when he had testified as a state's witness at the pre-sentence hearing for Joseph Tocco pursuant to a grant of immunity from the Arizona Attorney General's Office. The June 22 article reported that an unnamed source, interviewed in connection with the Tocco matter, had accused Romano of "placing a deadly bomb beneath the car of Phoenix newsman Don Bolles and detonating it" in 1976. We quote the article in part:

> The accusation against Romano was made in a 1983 tape-recorded interview by Chicago attorney Santo Volpe with an Arizona source whose identity is being withheld from publication for the person's safety.
>
> Until his withdrawal from the case six months ago, Volpe was legal counsel for purported Phoenix mob figure Joseph "Buddy" Tocco, a former Chicagoan, in criminal prosecution unrelated to the Bolles homicide.
>
> The claim of Romano's alleged connection with the Bolles murder apparently came unexpectedly as Volpe was developing background information on Romano and Sam Garee, both of whom were police informants against his client, another source close to the Tocco case told the Progress.
>
> A segment of the lengthy 1983 interview dealing with the Bolles murder, obtained this week by the newspaper, follows:
>
> VOLPE: "Let me ask you, do you know a fellow by the name of Roy Romano?
>
> SOURCE: "Yes. Oh, yeah. I know Roy. You don't want to mess with Roy."
>
> VOLPE: "How come?"
>
> SOURCE: "He's a mechanic."
>
> VOLPE: "Meaning what?"
>
> SOURCE: "He works on people's bodies, breaks your legs, your arm. He's killed several people. He was the one who put the bomb in that, uh, that, uh, that reporter's car out here and blew up the car. Roy Romano was the one because I've heard him talking about it. Roy, if you do wrong, Roy gets sent out. And if Roy sends out after you, you don't want to get caught."
>
> Later in the interview, the source complained that as a result of Romano having "turned state's evidence" against Tocco, "they're letting a killer walk free.

---

3. But see *Dombey,* 150 Ariz. at 487, 724 P.2d at 573, deriving from post-*Sullivan* and *Gertz* decisions the conclusion that "disregard must be more than 'reckless'—*conscious* disregard would be a better description of the test."

Romano will kill ya. He is not playing with a full deck of cards. He never has. And he gets his kicks out of breaking people's bones."

At last report, Romano apparently had gone into a legitimate business in the Flagstaff area.

The Progress has not been able to locate him for comment, however, and representatives of the state attorney general's office, responsible for the Tocco prosecution, have declined to talk to the newspaper on any matter related to the case.

### 2. The July 20 Article:

On July 20, 1984, the Progress published a second article by Don Devereux, entitled "2nd source names mobster in Bolles bombing." This source, the Progress reported, linked Romano to the bombing along with William Rocco D'Ambrosio and Frank Mossuto, two men who had earlier been reported as suspects in the Bolles case but had never been prosecuted for it. The article stated in part:

The latest source has reported receiving information in July 1976 that linked Romano, D'Ambrosio and Mossuto to the bombing plot.

Romano once assured law enforcement authorities, however, that the only homicide in which he ever was involved was the 1975 felony murder of James Lindsay, the Progress has learned.

Romano has been granted immunity by the Arizona attorney general's office for the killing of Lindsay, a Phoenix adult theater customer shot to death during an armed robbery allegedly committed by Romano and Kenneth Vertongen.

Romano has been a key state witness since 1982 in the extensive investigation and prosecution of purported Valley organized crime figure Joseph "Buddy" Tocco.

Sources close to the Tocco case have told the newspaper that Romano denied participation in any homicide other than Lindsay's in a sworn statement to law enforcement officials early in 1983.

The July 20 article quoted other unnamed sources as linking Romano to the mid–70's murder of a motorcycle gang member named David "Rabbit" Lish and proceeded to criticize the attorney general's grant of immunity to Romano. It stated:

Sam Garee, another witness in the Tocco case, reportedly warned state law enforcement officials in 1981 that Romano had the reputation of a killer. State officials apparently did little to explore those allegations with Romano, however, before making him a paid informant and granting him numerous immunities the following year.

### 3. The October 10 Column:

The third and last of the articles that provoked this suit appeared in the Progress on October 10, 1984. Titled "Open letter to the Arizona Republic," it served as a response by Jonathan Marshall, the Progress publisher, to an Arizona Republic article of September 30, 1984. The Republic had evoked Marshall's response by suggesting that Tocco had duped the Progress into discrediting Roy Romano and by quoting Romano as linking Tocco to the Don Bolles bombing. The Republic had stated:

Phoenix mob boss Joseph "Buddy" Tocco has claimed that Arizona Republic Reporter Don Bolles was killed by mistake when his car was blown up in June 1976, according to a former Tocco associate.

The dynamite bomb was planned to explode before Bolles got into his car and was intended to warn him to stop writing about mob activities in Phoenix, according to Roy Romano, 45, a one-time Tocco muscleman.

"Buddy hated Bolles' guts," Romano said, because the reporter had written articles identifying Tocco and many others as members of a growing Arizona branch of the Chicago syndicate.

Even though Bolles wasn't scheduled for death at the time of the bombing, Tocco later remarked, "That's one guy who needed killing," Romano said in an interview.

Only if Bolles failed to heed the warning and continued to write about the mobsters was he to be killed, Romano said.

The plan was to blow up Bolles' car, then telephone him at the Republic with the message, "We can get you anytime we want," Romano said Tocco told him.

The Republic reviewed the history of Romano's service as a state's witness against Tocco and explained that Romano had consented "to be interviewed by the Republic because he believed Tocco duped [the Progress] into publishing articles that claimed he murdered Bolles." The Republic additionally quoted an accusation made by an assistant attorney general in a Tocco case pleading to the effect that Don Devereux, the author of the June 22nd and July 20th Progress articles, had been " 'used' by Tocco and by his attorney ... to retaliate against Romano." The Republic reported that the attorney general had called upon the Progress to share any sources of evidence implicating Romano in the Bolles killing, but quoted Devereux as declining to do so because of what he believed to be mishandling of other information he had given to the attorney general's office.

Marshall's October 10th "Open letter" rejected "the implication that ... Devereux and the Progress somehow were duped by Tocco." Marshall further challenged

> the euphemistic references to Romano that paint him as a low-grade hoodlum. The [Republic] article noted that immunity granted Romano for his testimony against Joseph "Buddy" Tocco prevented his prosecution for relatively minor crimes of "shoplifting and buying stolen goods." This ignores the important fact that he also was given immunity for such major crimes as felony homicide, for participation in a 1975 armed robbery which resulted in the shooting death of James Lindsay.

Marshall continued that the Progress "now has four sources who claim to know about Romano's complicity in the Bolles murder," but added that the Progress would not disclose those sources to the attorney general's office "because in the past state investigators have leaked confidential information and frightened away confidential sources that had been provided to them by the newspaper."

Romano sought retraction; the Progress declined to retract; this lawsuit followed.

**B. Romano's Pre–Progress Public Exposure:**

On October 29, 1982, approximately twenty months before the first of the Progress articles, Roy Romano entered into an immunity agreement with the Arizona Attorney General's Office. The attorney general was then prosecuting Joseph Tocco in a case pending in the Superior Court in Maricopa County. Romano agreed to provide information regarding the offenses charged in the pending case and, additionally, with regard to "various offenses and activities engaged in by Tocco et. al." The information was to include an account of Romano's own participation as driver in an unsolved robbery-murder (the James Lindsay murder referred to in the July 20th article discussed above). The attorney general agreed that Romano's statements, if complete and truthful, would not be used against him in any state criminal prosecution for offenses involving Tocco or his fellow defendants in the pending case.

The state agreed initially to treat Romano as a confidential source and not to disclose "the fact of [his] statement or its contents unless and until ordered to do so or it is necessary to allow fair and full cross-examination of [him] at a deposition or judicial proceeding." Later, by addendum to his October 29th agreement, Romano agreed to serve as a witness in pending prosecutions of Tocco and other defendants and "that the fact and the extent of [his] cooperation could be disclosed...."

On November 16, 1982, Tocco pled guilty to a variety of crimes, including prostitution, fraud, burglary, robbery, and loansharking. The state sought a life sentence for Tocco at a pre-sentence hearing that commenced on November 22, 1983. Romano testified at the hearing. His testimony, which extended over a period of three weeks, was sensational and attracted predictable media attention.

His opening day of testimony was described by the Arizona Republic on November 23, 1983, in a front page article entitled

"Tocco heads crime 'wolf pack', enforcer says." The article began:

A former mob enforcer testified Tuesday that he committed scores of beatings, extortions, robberies and burglaries planned by Phoenix crime syndicate boss Joseph "Buddy" Tocco.

The article identified Romano and explained that he had been granted prosecutorial immunity in exchange for his testimony. It recounted Romano's revelation that he had participated in a robbery of the Pornorama Adult Theater in 1976, that his accomplice had fatally shot a person named James Donald Lindsay in the course of that robbery, and that Tocco had supplied the murder weapon and had helped to cover up the murder. The article went on:

Romano testified that the pistol was in an arsenal of untraceable weapons maintained by Tocco. Tocco passed out the firearms "when a guy needed killing," Romano said.

He testified that Tocco also supplied him with baseball bats to "whack" people against whom the mob leader had grievances.

One such "whacking" was vividly described in testimony on November 23 and recounted by the Arizona Republic on November 24 in the lead article on the front page of its second section. The Republic stated:

The manager at a bar featuring nude dancers testified Wednesday that the "nose was ripped off my face" when he was pistol-whipped by a mob muscleman on orders of Joseph "Buddy" Tocco, the leader of a Phoenix crime syndicate.

The article quoted Romano as acknowledging that he had administered the beating with the same pistol later used in the Lindsay killing and that the purpose of the beating was to pressure the bar owner into giving Tocco an interest in the business. It continued:

Lindsay's death was not planned, but the attack on [the bar operator] was among many such jobs executed for Tocco, Ro-

mano said. He testified that Tocco sometimes gave him none or little of the take from robberies and burglaries he committed at Tocco's direction.

Romano's testimony in the extended Tocco hearing was the subject of further articles in the Republic, Arizona's largest newspaper, on November 29, December 8, and December 11, 1983, and in the Phoenix Gazette, Arizona's second largest newspaper, on November 30 and December 1, 1983. The November 30 Gazette article noted:

[Romano] has admitted committing dozens of beatings, burglaries and robberies planned by Tocco. For three days now, he has described in exhaustive detail how he, Tocco and others schemed to commit the crimes—often within a few feet of unsuspecting Valley residents going about their business in restaurants or motels.

Romano's testimony at the Tocco presentence hearing implicated neither Tocco nor himself in the Don Bolles murder. However, in a December 11, 1983, article entitled "Role in Bolles trial haunted mobster," the Republic cited statements by Romano and his fellow witness Sam Garee to the effect that Tocco feared a perjury indictment for alibi testimony Tocco provided James Robison at Robison's 1977 trial for the murder of Bolles.[4] The article continued:

[Garee's and Romano's] statements about Tocco's fear of perjury charges were part of the court record of a $2 million civil racketeering case pending against the gang leader.

Romano, who served Tocco as a muscleman enforcer, said in an interview that the Bolles murder virtually halted organized-crime activities in the Valley for two or three years.

The investigative heat created by the bombing caused police and newsmen to scrutinize individuals and situations that under ordinary circumstances would have aroused little or no interest, accord-

---

**4.** Robison's conviction was overturned by the Arizona Supreme Court in *State v. Robison,* 125

Ariz. 107, 608 P.2d 44 (1980).

ing to Romano, who has been given immunity in exchange for his testimony against Tocco.

Subsequently, Romano said, the crime scene reverted to normal.[5]

As far as we can determine from the record provided, the Arizona Republic article of December 11, 1983, was the last Phoenix area newspaper article to feature Romano until June 22, 1984, when the Progress published the first of its accusations that Romano was a participant in the Don Bolles murder.

### C. Defining the Range of Romano's Reputational Self Exposure:

■ In return for the benefits of his immunity agreement with the state, Roy Romano accepted the role of principal witness for the Tocco prosecution. The trial court found, however, that, if he thereby assumed public figure status to any extent, he did so only as to the narrow range of racketeering activities in which he acknowledged serving Joseph Tocco. This limited public figure status, in the trial court's view, did not encompass journalistic comment associating Romano with the murder of Don Bolles. We believe that the trial court defined Romano's public figure status too narrowly. In analyzing this issue, we focus on the reputational risks to which Romano voluntarily exposed himself when he accepted the benefits and burdens of his immunity agreement with the state.

We derive this focus from *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where the Supreme Court of the United States gave fullest definition to public figure status. As backdrop to its exposition of the reputational risks of public figures, the court compared public *officials* with private individuals. The former, the court stated, accept as one of the "necessary consequences of . . . involvement in public affairs . . . the risk of closer public scrutiny than might otherwise be the case." 418 U.S. at 344, 94 S.Ct. at

3009, 41 L.Ed.2d at 808. Most private individuals, by contrast, "[relinquish] no part of [their] interest in the protection of [their] own good name." 418 U.S. at 345, 94 S.Ct. at 3010, 41 L.Ed.2d at 808. Some private persons, however, relinquish that interest to some degree by "voluntarily inject[ing]" themselves into "a limited range of [public] issues." They "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" and, in so doing, "invite attention and comment." 418 U.S. at 345 and 351, 94 S.Ct. at 3009 and 3013, 41 L.Ed.2d at 808 and 812.

Such persons, the Court concluded, are public figures for a limited range of issues, and, if injured by falsehoods published in the course of journalistic comment on those issues, can recover only upon satisfying the demanding *New York Times v. Sullivan* requirement of proving "actual malice" by clear and convincing evidence.

The language throughout *Gertz* emphasizes the element of voluntary self-exposure in the acquisition of public figure status. One *assumes* a role of special prominence in the resolution of a public issue, *relinquishes* a degree of privacy, *invites* attention and comment, and *runs the risk* of closer public scrutiny; in consequence, he *exposes* his reputation to the harmful inaccuracies he must tolerate as a member of a society which accords constitutional "breathing space" to a free press. 418 U.S. at 342, 94 S.Ct. at 3008, 41 L.Ed.2d at 806. *See also Dombey*, 150 Ariz. at 484–5, 724 P.2d at 570–1 ("Whatever requirement there might be to 'thrust' oneself into a public controversy . . . [is] satisfied by . . . [one's] voluntary participation in activity calculated to lead to public scrutiny.")

■ Before considering the extent of Romano's reputational self exposure, we address his preliminary argument that his self exposure was involuntary and did not engender public figure status at all. Citing *Time, Inc. v. Firestone*, 424 U.S. 448, 96

---

**5.** Romano's comments to the Republic were not his only comments on the Don Bolles bombing. He has acknowledged in deposition in this case that, before the appearance of the Progress stories, he had indicated in a statement to the attorney general's office that Joseph Tocco had certain background knowledge concerning the murder of Don Bolles.

S.Ct. 958, 47 L.Ed.2d 154 (1976), he argues the correctness of the trial court's comment that "a private individual does not become a public figure by becoming associated with a matter that attracts public attention." Citing *Wolston v. Readers Digest Ass'n.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), he argues the correctness of the trial court's comment that "a private individual who engages in criminal conduct does not automatically become a 'public figure' for libel law."

Though the cited statements are correct, neither they nor the *Time* and *Wolston* cases from which they are derived support Romano's claim of private figure status. Plaintiff in *Time, Inc. v. Firestone* was a party to a lurid and highly publicized marital dissolution trial. She sued Time for publishing what she claimed was a false and defamatory account of her divorce. Plaintiff was not, the court held, a public figure. Her resort to the public forum of the court was a matter of necessity, the means to end her marriage. And though her dissolution held some interest "to some portion of the reading public," plaintiff had "assumed no special prominence in the resolution of public questions." 424 U.S. at 454, 455, 96 S.Ct. at 965, 47 L.Ed.2d at 163.

The plaintiff in *Wolston* was the nephew of persons who pled guilty in 1957 to charges of espionage for the Soviet Union. *Wolston* was interviewed by the F.B.I. at the time that his aunt and uncle were arrested and, on several later occasions, gave grand jury testimony pursuant to subpoena. In 1958, however, he failed to respond to a grand jury subpoena. There followed an order to show cause why he should not be held in contempt of court. The plaintiff ultimately pled guilty to contempt, received a one-year suspended sentence, and was placed on probation, conditioned on his further cooperation with the grand jury. The contempt proceedings against the plaintiff resulted in what the Supreme Court called a "flurry of publicity," after which the plaintiff "succeeded for the most part in returning to the private life he had led prior to the issuance of the grand jury subpoena." 443 U.S. at 163, 99 S.Ct. at 2705, 61 L.Ed.2d at 457. Sixteen years

later, in 1974, plaintiff was defamed by a publication falsely listing him "among Soviet agents identified in the United States." 443 U.S. at 159, 99 S.Ct. at 2703, 61 L.Ed.2d at 455. The Supreme Court addressed the issue whether plaintiff's 1958 guilty plea to contempt charges and the publicity attendant upon those charges rendered him a public figure for purposes of the 1974 publication. The plaintiff had not "injected" himself into the espionage controversy, the Court noted; rather, he was "dragged unwillingly into the controversy" by the government.

> [P]etitioner never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge. It is clear that petitioner played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espionage. We decline to hold that his mere citation for contempt rendered him a public figure for purposes of comment on the investigation of Soviet espionage.

443 U.S. at 166, 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 461.

Romano's case differs from *Firestone* and *Wolston* in significant respects. The first distinction lies in the subject matter of the testimony from which his public figure status flowed. Neither Firestone nor Wolston took a prominent position in the resolution of a public controversy. The Firestone divorce was a private controversy that happened to arouse public attention as it played out in a public court. The espionage controversy that engulfed Wolston was a public one, but Wolston was an insignificant figure caught up on its fringe. Neither in open court nor in news interviews did he reveal himself as knowledgeable about Soviet espionage; his sole public involvement was to answer contempt charges and to explain a single instance of failure to appear at a private grand jury hearing. Romano, by contrast, knowledgeably detailed the operations of an organized crime syndicate in Arizona. His testimony was more than merely newsworthy. *Wolston*, 443 U.S. at 167, 99 S.Ct. at 2707,

61 L.Ed.2d at 460. It was central to a matter of great public concern.

Second, Romano was not simply drawn into a public forum against his will to defend himself against action by the state. Certainly Romano's immunity agreement prevented action by the state, and we may safely assume that the state employed the heavy leverage of investigation and impending prosecution to initiate its bargain with Romano. We may further assume that Romano would have preferably kept his criminal activities private, never attracting the state's attention. Yet the state brought ample consideration to the bargain; it offered Romano the very substantial benefit of immunity. And in choosing, as the price of immunity, to assist the state in exposing Joseph Tocco, Romano undertook to expose himself as well. Such reputational self-exposure was among the costs of a highly beneficial bargain, and we decline to hold that Romano assumed that cost involuntarily.

Third, the risk of eventual, unflattering limelight was entailed in Romano's choosing a life of crime. The United States Supreme Court declined in *Wolston* to hold that "any person who engages in criminal conduct automatically becomes a public figure...." *Wolston*, 443 U.S. at 168, 99 S.Ct. at 2708, 61 L.Ed.2d at 461. Romano, however, was not simply "any person who engages in criminal conduct"; he was, rather, a career criminal who, by his own admission, willingly participating in beatings, robberies, burglaries, and extortions on behalf of a criminal syndicate. Romano acknowledges "maybe a hundred" acts of residential and commercial burglary, felony theft "about 85 times or so," more than a hundred sales of stolen property, several graphic instances of violent extortion, multiple perjuries, occasional insurance frauds, and various other crimes. Given the nature, duration, and intensity of this behavior, he "cannot complain that the spotlight eventually turned on him." *Dombey*, 150 Ariz. at 485, 724 P.2d at 571.

We conclude that Romano was a public figure. Analysis turns to the contours of his public figure status. We take their measure by examining the risk Romano ran of closer public scrutiny. *Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. *See also Dombey*, 150 Ariz. at 484–5, 724 P.2d at 570–1. This risk, he suggests, merely encompassed hostile public reaction to the crimes that he revealed. We reject that argument, as we reject the trial court's conclusion that his risk ran only to the borders of the controversy over the criminal activity of the Tocco band. The Constitution provides more "breathing space" than that.

One risk Romano clearly ran is that the public would critically scrutinize the costs and benefits of the immunity agreement that the state extended him. What kind of a man had the state allied with? Was his information credible? Were his revelations thorough? Should a man like Romano be shielded from criminal justice? If so, how far did the shield extend, and how far should it extend?

In describing the first risk, we have alluded to a second: that the public, including its probing representatives, the media, would inquire whether Romano, with or without Tocco, had participated in other, more serious crimes than those he had disclosed to Tocco's prosecutors.

Both risks came to bear in the series of publications by the Progress. The source for the June 22 article, the first in the Progress series, was an interview arising from the Tocco case itself. Its thrust was not simply that Romano had killed Don Bolles but that, "as a result of Romano having 'turned state's evidence' against Tocco, 'they're letting a killer walk free....' " The second and third articles continued the theme of questioning whether state law enforcement officials had adequately explored Romano's reputation as a killer "before making him a paid informant and granting him numerous immunities...."

We find ample nexus between the Progress articles and the public issues raised by Romano's immunity-shielded testimony for the state. A glove-like fit is not required. We conclude that the Progress articles addressed issues that Romano had

exposed as a public figure to journalistic scrutiny and public concern.[6]

For the purpose of this holding, we assume the falsity of the allegation that Romano participated in killing Don Bolles. We turn to the question whether Romano has satisfied his burden of proving that the Progress either knowingly published a false accusation or that it entertained serious doubts as to the truth of its accusation, but proceeded in conscious disregard of such doubts. *St. Amant v. Thompson,* 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262, 267–68 (1968); *Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. at 487, 724 P.2d at 753.

### III. *Absence of Malice*

If the trial court had merely declared Romano a private figure and relieved him of the burden of proving actual malice as an element of his compensatory damage claim, our opinion would now end. We would reverse, hold Romano a public figure, and remand for the trial court's determination whether Romano's evidence could meet the rigorous constitutional malice standard.

The trial court's ruling was not so limited, however. The Progress not only moved for summary judgment as to the entirety of Romano's claim, but, alternatively, for partial summary judgment as to his punitive damage claim. This alternative motion, like the primary motion, was denied.

 Romano has never disputed that the Progress articles addressed matters of public concern. Where a defamation suit arises from publications on matters of public concern, even a private figure must produce clear and convincing evidence of actual malice in order to reach a jury with a punitive damage claim. *Gertz,* 418 U.S. at 348, 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810, 811; *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Thus, in denying summary judgment to the Progress on the issue of punitive damages, the trial court necessarily viewed Romano's evidence as adequate to support a jury finding of actual malice. In the exercise of our appellate obligation to "make an independent examination of the whole record" to prevent "forbidden intrusion on the field of free expression," we reach a contrary conclusion. *New York Times v. Sullivan,* 376 U.S. at 284–6, 84 S.Ct. at 728–9, 11 L.Ed.2d at 709–10. We hold that no jury applying the "clear and convincing" evidentiary standard could reasonably find actual malice from the evidence that the plaintiff presented in the summary judgment proceeding.[7]

---

**6.** Moreover, in statements to the attorney general's office and to the Arizona Republic before the Progress articles were published, Romano professed hearsay background knowledge about the Don Bolles killing and about Tocco's testimony at the James Robison trial. He reiterated such statements to the Republic in an interview before the third Progress article appeared. These facts are not essential to our holding, but they bolster it. Romano could freely have foreseen that he might be suspected of not telling all he knew and that he might be inviting scrutiny and comment concerning his own involvement in the Bolles affair.

**7.** "Actual malice" has been propounded by the United States Supreme Court as a constitutional prerequisite to the recovery of punitive damages for defamation in the course of comment on public issues. *Dun & Bradstreet,* 472 U.S. 749, 105 S.Ct. 2939, 866 L.Ed.2d 593. "Evil mind" has been propounded by the Arizona Supreme Court as a prerequisite to the recovery of punitive damages for any form of tort in Arizona. *See, e.g., Gurule v. Illinois Mut. Life & Cas. Co.,* 152 Ariz. 600, 734 P.2d 85 (1987). There is considerable overlap in definition of these standards. Both "may be established by defendant's express statements or inferred from defendant's expressions, conduct, or objectives." Compare *Gurule,* 152 Ariz. at 602, 734 P.2d at 87 with *Selby v. Savard,* 134 Ariz. 222, 225, 655 P.2d 342, 345 (1982). Both must be proven by clear and convincing evidence. The "actual malice" standard, as we have previously noted, is satisfied by proof that the defendant "in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. Our Supreme Court has commented that "conscious disregard" would better describe the actual malice test than "reckless diregard." *Dombey,* 150 Ariz. at 487, 724 P.2d at 573. The "evil mind" standard is satisfied by proof similarly defined. Our supreme court stated in *Gurule,*

"[E]vil mind," is established by evidence that defendant either (1) "intended to injure the plaintiff ... [or (2)] consciously pursued a course of conduct knowing that it created a

## A. The Standard of Review

■ In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court undertook to define the process of summary judgment screening for actual malice in a constitutional defamation case. The District of Columbia Court of Appeals had found it irrelevant to summary judgment that the plaintiff must persuade a fact-finder of actual malice by *clear and convincing* rather than *preponderant* evidence. Justice Scalia, then a member of the circuit court, wrote that to impose the greater evidentiary burden at summary judgment "would change the threshold summary judgment inquiry from a search for a minimum of facts supporting the plaintiff's case to an evaluation of the weight of those facts and (it would seem) of the weight of at least the defendant's uncontroverted facts as well." *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1570 (1984). The Supreme Court reversed, observing that, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed. 2d at 215. The Court contrasted weighing the evidence to "determine the truth of the matter," a jury function, with screening the evidence to determine "whether there is a genuine issue for trial," a judicial function. *Id.* at 249, 106 S.Ct. at 2511, 97 L.Ed.2d at 212. It concluded:

> Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Id.* at 255–56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. *See also Dombey*, 150 Ariz. at 485–486, 724 P.2d at 571–572.[8]

We apply this standard to the evidence of this case.

---

substantial risk of significant harm to others." This standard is satisfied by evidence that defendant's wrongful conduct was motivated by spite, *actual malice*, or intent to defraud. Defendant's *conscious and deliberate disregard* of the interests and rights of others *also will suffice.*

(Emphasis added; internal citations omitted). 150 Ariz. at 602, 734 P.2d at 87. Despite the substantial correlation between the two standards, no Arizona case has yet squarely framed the issue whether, when a defamation plaintiff has presented a submissible case of actual malice, he has thereby necessarily presented a submissible case of evil mind. Nor does this case frame that issue. Plaintiff's failure to prove actual malice disposes of the entirety of his claim and relieves us of addressing the niceties of the distinction, if any, between actual malice and evil mind.

**8.** The majority opinion in *Anderson* was sharply criticized in a dissenting opinion by Justice Rehnquist for "afford[ing] the lower courts no guidance whatsoever as to what, if any, difference the abstract standards that it propounds would make in a particular case." 477 U.S. at 271, 106 S.Ct. at 2522. (Rehnquist, J., dissenting). Justice Brennan likewise remarked the difficulty of "squar[ing] the direction that the judge 'is not himself to weigh the evidence' with the direction that the judge also bear in mind the 'quantum' of proof required and consider whether the evidence is of sufficient 'caliber or quality' to meet that 'quantum.'" *Id.* at 266, 106 S.Ct. at 2519, 91 L.Ed.2d at 223 (Brennan, J., dissenting.)

We follow, as we must, the majority opinion in this constitutional malice case. The question arises, however, what import, if any, *Anderson* has for the summary judgment process in *non*-defamation cases involving issues to be proven by clear and convincing evidence. Are judges to view all evidence at the summary judgment stage "through the prism of the [applicable] substantive evidentiary burden?" Or does *Anderson* simply articulate a constitutionally mandated rule of heightened screening for defamation cases involving questions of actual malice? *Anderson* does not answer this question. Nor does *Dombey*, where our supreme court conducted an *Anderson*-like screening of the evidence in a constitutional malice case. 150 Ariz. at 490, 724 P.2d at 576. Because our disposition of this case does not require us to decide this issue, we merely identify it, leaving its resolution for another day.

## B. Application to the Evidence

In the course of this proceeding the Progress disclosed that Cynthia Roberts was the unnamed source for its June 22nd article and that Keith Nation was the unnamed source for its July 20th article.

Don Devereux described by affidavit his preparation of those articles:

Prior to writing the articles ..., I carefully and thoroughly researched the stories. For example, I:

a. reviewed the Cynthia Roberts tape recording carefully, checking the backgrounds of both Cynthia Roberts and Roy Romano extensively;

b. reviewed Roy Romano's testimony in the *Tocco* case (C 471228) at length;

c. reviewed Romano's 1980 bankruptcy petition (and related public records) carefully;

d. reviewed the many newspaper articles concerning Roy Romano and his criminal exploits;

e. consulted former Phoenix Police Detective Jack Weaver about Romano (and the plausibility of the statements contained in the Roberts tape, which he confirmed);

f. obtained and verified similar information about Roy Romano from others, including Keith Nation, Leo Lane and Kenneth Vertongen;

g. conferred with my publisher, managing editor and our attorneys; and

h. sought repeatedly to locate Roy Romano (who, according to his deposition testimony in this lawsuit, was living in St. Louis, Missouri, at the time) by contacting, for example, Cameron Holmes, an assistant Arizona Attorney General, Jack Weaver and several confidential sources.

Jonathan Marshall expressed his confidence in Devereux by affidavit and indicated his own process of review as follows:

Prior to the publication of the first article at issue in this lawsuit, I listened to the Cynthia Roberts tape recording twice and carefully reviewed a typed transcript of the tape. Prior to the publication of the articles ..., I spent many hours working diligently on the preparation of the articles for publication.

Both Devereux and Marshall indicated by affidavit that they "entertained no serious doubts about the truth of the statements contained in the articles" at the time of publication and had developed no such doubts "after two years of litigation and extensive discovery in this lawsuit." Both men testified at depositions to the same effect.

■ These professions by the defendants are not, of course, conclusive. The elements of actual malice may be inferred from objective facts. *Bose v. Consumers Union*, 692 F.2d 189 (1st Cir.1982), aff'd 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502. Our Supreme Court stated in *Selby v. Savard*, 134 Ariz. 222, 225, 655 P.2d 342, 345 (1982), "[A] defamation defendant cannot escape liability merely by alleging subjective belief in the truth of the matter published. '[P]roof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred'" The determination whether a defendant "in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts." *Bose*, 692 F.2d at 196.

■ Romano seeks to meet his burden by several converging avenues of inference. The first begins with his claim of a mistranscription of the Cynthia Roberts tape. The allegedly mistranscribed portion of the tape was quoted by the Progress in the June 22 article as follows:

He was the one who put the bomb in that, uh, that, uh, that reporter's car out here and blew up the car. Roy Romano was the one because I've heard *him* talking about it.

(Emphasis added.)

Romano provided the trial court with an affidavit and report by a doctor of English linguistics, who conducted a detailed phonological analysis of the Roberts tape and concluded that Ms. Roberts probably said, "... I've heard *them* talking about it" rather than "... I've heard *him*...." The

"them" to whom Ms. Roberts referred, according to Romano, should have been understood from the context of the interview to include Sam Garee, whom Ms. Roberts described elsewhere in the same interview as "a two-faced snitch" with a "tendency of lying a lot." Thus, as we understand Romano's argument, had the Progress properly understood the tape or had it achieved a proper transcription of the tape, it would have recognized that Roberts was not repeating Romano's *self*-implication, but was only repeating the accusation of Sam Garee, a man she regarded as a liar.

Romano submitted the affidavit of Jimmy Dale Patten, an associate professor of journalism at the University of Arizona, who stated the opinion that the Progress "failed to meet the standard of care of a reasonable journalist" because, among other reasons:

> It was inappropriate to rely on information provided by Cynthia Roberts when the reporter knew or should have known that Cynthia Roberts was repeating information from another person, whom Cynthia Roberts believed to be untruthful.

Assuming the accuracy of the phonological analysis of the Roberts tape and, thus, assuming that Roberts used the word "them" rather than "him", we find no reasonable chain of inference therefrom to the conclusion that the Progress entertained serious doubts as to the accuracy of its report and proceeded to publish despite them. Romano provides no basis for concluding that the misinterpretation of "them" as "him" should have been apparent to Devereux or Marshall. He presents no evidence that either defendant was phonologically trained. His linguistic expert, though able by complex analysis to express an opinion as to what Ms. Roberts probably said, offers no opinion that "them" rather than "him" should have been clear to the untrained ear. If, as appears from his report, an untrained listener could reasonably have interpreted the word as "him" and could thereby have understood Roberts to have once heard Romano implicate himself in the Don Bolles bombing, there was surely no "obvious reason to doubt ... the accuracy of [Roberts's] report[ ]." *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268. Indeed her report, as understood by the Progress, gains plausibility from Romano's acknowledgment at deposition that he may have bragged to his associates about crimes he did not commit.

We conclude that Romano's evidence of mistranscription and misconstruction of the Roberts tape does not amount to clear and convincing evidence of actual malice.

■ Romano also argues that malice can be inferred from the Progess's repetition of serious charges without retraction. Romano cites *Restatement (Second) of Torts* § 580 A comment d for the proposition, "Republication of a statement *after the defendant has been notified* that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless diregard." (Emphasis added). The flaw in this argument is that Romano has produced no evidence that he demanded retraction before the third of the Progress articles appeared. Repetition of serious charges does not in and of itself support the inference of actual malice in the absence of any indication that the publisher disregarded intervening evidence of their falsity. *See, e.g., Selby v. Savard*, 134 Ariz. 222, 655 P.2d 342 (1982); *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 724 P.2d 562 (1986).

Romano's other arguments to establish actual malice may be clustered together. From the Patten affidavit Romano advances the proposition that the Progress fell short of "the standard of care of a reasonable journalist" by accusing Romano of murder without including his response and by basing that accusation "solely on information provided by a source who is not on record and who is of questionable character." Keith Nation, the source of the second article, should have been suspect, Romano argues, for two reasons: first, because Devereux knew of a 1976 police report in which Nation was described as "offer[ing] no information as to bombing suspect ...," and second, because Dev-

ereux, by the time of publication, had used Nation for five years as a general source for his Bolles investigation without Nation ever previously naming Romano as a participant. Romano continues his argument by pointing out that John Harvey Adamson has admitted to placing the bomb that killed Don Bolles; he adds that Devereux, Marshall, and the Progess had pursued the Bolles investigation for years before 1984, naming many people as knowledgeable about the case, without ever previously listing Roy Romano as one of them. From this series of assertions Romano draws the argument that the Progress should have recognized the 1984 reports of Romano's involvement as inherently improbable and that its publication of those charges with only a limited investigation constitutes a basis for the inference of actual malice.

This argument falls far short. The Bolles murder remains largely unresolved despite Adamson's confession and conviction. Although Keith Nation had not previously identified Roy Romano as a participant in the Bolles murder, it is not implausible that his recollection of useful particulars was refreshed or released by the spate of publicity accorded Romano for his 1983 testimony in the Tocco hearing. Devereux detailed his effort to check his stories, including his effort to locate and interview Romano.

The weakness of Romano's proof is highlighted by comparison with the proof in *Dombey* and *Selby,* two cases that Romano invokes for support. In *Dombey* a newspaper repeatedly published defamatory articles about a public figure despite contrary facts in its own previous articles and despite detailed contradictory information provided by the plaintiff and his associate. In the midst of its series of articles, the newspaper received a detailed request for retraction, citing specific inaccuracies and the facts to refute them, but the managing editor did not read it. 150 Ariz. at 489, 724 P.2d at 575. In *Selby* a private, non-media defendant defamed a public official, settled the resulting lawsuit when advised by his attorney that the charges were "completely without merit," repeated the charges in a complaint to the Department of Public Safety, was advised by the DPS investigator that the charges lacked substance, and nonetheless continued to spread the accusations. 134 Ariz. at 223–24, 655 P.2d at 343–44.

When Romano's case is measured against these cases, it amounts at most to what Professor Patten labelled it—a case of negligent investigation. It is well established, however, that actual malice "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. Nor it is "based on journalistic standards or their breach," *Dombey,* 150 Ariz. at 489, 724 P.2d at 575. "Actual malice is subjective," *Id.* Because Romano has failed to produce significant probative evidence that the defendants published the challenged articles in conscious disregard of subjective, serious doubts, we are obliged to end this suit.

### Conclusion

Romano's evidence cannot be reasonably interpreted by a jury as clear and convincing evidence of actual malice. Because the Progress articles addressed public issues in which Romano had voluntarily exposed himself to scrutiny as a public figure, his failure to produce evidence of actual malice entitles the Progress to summary judgment against the entirety of his complaint.

We accept jurisdiction, reverse the judgment of the trial court, and remand with instructions to enter summary judgment in favor of all defendants.

BROOKS, P.J., and KLEINSCHMIDT, J., concur.