SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| CITIZEN PUBLISHING CO., an Arizona Corporation, | ) ) ) | Arizona Supreme Court No. CV-04-0280-PR |
| Petitioner, | ) ) ) | Court of Appeals Division Two |
| v. | ) ) | No. 2 CA-SA 04-0041 |
| HON. LESLIE MILLER, JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, in and for the County of Pima, | ) ) ) ) ) | Pima County Superior Court No. C20040194 |
| Respondent Judge, | ) ) | **O P I N I O N** |
| ALY W. ELLEITHEE and WALI YUDEEN S. ABDUL RAHIM, | ) ) ) | |
| Real Parties in Interest. | ) ) ) | |

Special Action from the Superior Court of Pima County
The Honorable Leslie B. Miller, Judge
No. C20040194

**REVERSED AND REMANDED WITH INSTRUCTIONS**

Petition for Review from Order of the Court of Appeals,
Division Two
No. 2 CA-SA 04-0041

STEPTOE & JOHNSON, LLP                                              Phoenix
        By  David J. Bodney
            Peter S. Kozinets
            Chris Moeser
Attorneys for Citizen Publishing Company

HERBERT BEIGEL & ASSOCIATES, LLC                                     Tucson
        By  Herbert Beigel
Attorneys for Aly W. Elleithee and Wali Yudeen S. Abdul Rahim

MAYNARD CRONIN ERICKSON CURRAN & SPARKS, P.L.C.          Phoenix
     By  Daniel D. Maynard
Attorneys for Amicus Curiae The Thomas Jefferson Center for the
Protection of Free Expression

PERKINS COIE BROWN & BAIN, P.A.                          Phoenix
     By  Daniel C. Barr
Attorneys for Amicus Curiae The Reporters Committee for Freedom
of the Press

**H U R W I T Z**, Justice

¶1     The issue before us is whether liability for intentional infliction of emotional distress can be imposed against a newspaper for printing a letter to the editor about the war in Iraq.

## I.

¶2     On December 2, 2003, the *Tucson Citizen* ("the *Citizen*") published a letter on its Op-Ed page from Emory Metz Wright, Jr.  In its entirety, the letter stated:

> We can stop the murders of American soldiers in Iraq by those who seek revenge or to regain their power. Whenever there is an assassination or another atrocity we should proceed to the closest mosque and execute five of the first Muslims we encounter.
>
> After all this is a "Holy War" and although such a procedure is not fair or just, it might end the horror.
>
> Machiavelli was correct.  In war it is more effective to be feared than loved and the end result would be a more equitable solution for both giving us a chance to build a better Iraq for the Iraqis.

¶3     The letter prompted immediate adverse reaction.  From December 4 through 6, 2003, the *Citizen* published twenty-one

letters from readers who criticized Wright's letter. Among the critical letters was one from real party in interest Aly W. Elleithee.

¶4 On January 13, 2004, Elleithee and Wali Yudeen S. Abdul Rahim ("Plaintiffs") filed a complaint in superior court in Pima County against the *Citizen* and Wright for assault and intentional infliction of emotional distress, seeking damages and injunctive relief.[1] Plaintiffs sought to represent a putative class of "all Islamic-Americans who live in the area covered by the circulation of the *Tucson Citizen*, including the reach of the Internet website published by the *Tucson Citizen*."

¶5 The *Citizen* moved to dismiss the complaint for failure to state a claim pursuant to Arizona Rule of Civil Procedure 12(b)(6). The superior court dismissed the assault claim but declined to dismiss Plaintiffs' claim for intentional infliction of emotional distress, holding that "reasonable minds could differ in determining whether the publication of the letter rose to the level of extreme and outrageous conduct" needed to establish the emotional distress tort. The court also rejected the *Citizen's* First Amendment argument for dismissal, reasoning

---

[1] The *Citizen* is published by Citizen Publishing Company, the named defendant below. For convenience, we refer to both the publishing company and the newspaper itself as "the *Citizen*" in this opinion. The other defendant named in the complaint, Wright, was not served with the complaint and was therefore not involved in the proceedings below.

that "a public threat of violence directed at producing imminent lawlessness and likely to produce such lawlessness is not protected."

¶6     The *Citizen* filed a special action petition in the court of appeals seeking review of the superior court's order refusing to dismiss the intentional infliction of emotional distress claim.  The court of appeals, by a 2-1 vote, declined to accept jurisdiction.  The *Citizen* then filed a petition for review in this Court.  We granted the petition because of the public importance of the issue presented.  We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") § 12-120.24 (2003).

## II.

¶7     This case involves an unusual exercise of our discretionary review.  "[B]ecause relief by special action is largely discretionary, we follow a general policy of declining jurisdiction when relief by special action is sought to obtain review of orders denying motions to dismiss . . . ." *United States v. Superior Court (In re the General Adjudication of All Rights to Use Water in the Gila River System and Source)*, 144 Ariz. 265, 269, 697 P.2d 658, 662 (1985).  This policy recognizes that special action review of such interlocutory rulings "often frustrates the expeditious resolution of claims, unnecessarily increases both appellate court caseload and

4

interference with trial judges, harasses litigants with prolonged and costly appeals, and provides piecemeal review." *City of Phoenix v. Yarnell (Smith)*, 184 Ariz. 310, 315, 909 P.2d 377, 382 (1995). It follows that we will rarely review the court of appeals' discretionary refusal to accept jurisdiction of a special action challenging the denial of a motion to dismiss or motion for summary judgment.

¶8      There is good reason to depart from this general rule, however, when a suit raises serious First Amendment concerns. In *Scottsdale Publishing, Inc. v. Superior Court (Romano)*, the court of appeals made an "exception" to its usual reluctance to review a denial of summary judgment by special action because of "the public's significant first amendment interest in protecting the press from the chill of meritless libel actions." 159 Ariz. 72, 74, 764 P.2d 1131, 1133 (App. 1988). Other courts have come to similar conclusions. *See, e.g., Washington Post Co. v. Keogh*, 365 F.2d 965, 966–67, 968 (D.C. Cir. 1966) (hearing an interlocutory appeal from the denial of a motion for summary judgment in a defamation case); *Schaefer v. Lynch*, 406 So. 2d 185, 187 (La. 1981) (recognizing an exception to the general rule prohibiting appeals from a court's refusal to grant summary judgment in cases implicating the First Amendment to avoid a "chilling effect" on the freedom of press); *cf. AMCOR Inv. Corp. v. Cox Ariz. Publ'ns, Inc.*, 158 Ariz. 566, 568, 764 P.2d 327,

5

329 (App. 1988) ("[W]hen the complaint implicates the fundamental value of freedom of the press, there is good reason for a court to examine the complaint with a more rigorous eye in order not to burden public debate with insupportable litigation.").

¶9        In cases in which an appellate court can determine from the pleadings a case-dispositive First Amendment defense, special action review of a trial court's refusal to grant a motion to dismiss may be appropriate. Such a procedure "relieve[s] the parties and the court of a prolonged, costly, and inevitably futile trial" and protects First Amendment rights. *Scottsdale Publ'g,* 159 Ariz. at 74, 764 P.2d at 1133.

¶10        This is such a case. There is no dispute about the content of the letter to the editor that forms the basis for this litigation; the letter is set forth in its entirety in the complaint. The only issue is whether the publication of that letter is protected by the First Amendment. We therefore proceed to the merits of that issue.

### III.

### A.

¶11        The tort of intentional infliction of emotional distress requires proof of three elements:

> *[F]irst,* the conduct by the defendant must be "extreme" and "outrageous"; *second,* the defendant must either intend to cause emotional distress or

6

recklessly disregard the near certainty that such distress will result from his conduct; and *third,* severe emotional distress must indeed occur as a result of defendant's conduct.

*Ford v. Revlon, Inc*., 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987); *accord* Restatement (Second) of Torts § 46 (1965). For present purposes, we assume *arguendo* that the superior court correctly held that Plaintiffs' complaint stated a claim for intentional infliction of emotional distress.

¶12     However, our assumption that the complaint states a claim for relief under Arizona tort law merely begins the inquiry. The First Amendment to the United States Constitution, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The landmark case of *New York Times Co. v. Sullivan* recognized that the enforcement of state tort law through civil litigation may "impose invalid restrictions on . . . constitutional freedoms of speech and press" and thus constitute state action denying due process of law in violation of the Fourteenth Amendment. 376 U.S. 254, 265 (1964); *accord NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 916 n.51 (1982) ("Although this is a civil lawsuit between private parties, the application of state rules of law by the . . . state courts in a manner alleged to restrict First Amendment freedoms constitutes

7

'state action' under the Fourteenth Amendment."). The Supreme Court has most often applied the *New York Times* doctrine in the context of defamation actions, but it has expressly recognized that the same First Amendment principles apply to tort suits alleging speech-based intentional infliction of emotional distress. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).

¶13    While speech involving private matters "is not totally unprotected by the First Amendment," *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749, 760 (1985), in most such cases a state's interest in compensating its citizens for injuries arising from tortious speech will outweigh any First Amendment concerns, *id*. at 757-61. "Generally speaking the law does not regard the intent to inflict emotional distress as one which should receive much solicitude, and it is quite understandable that most if not all jurisdictions have chosen to make it civilly culpable where the conduct in question is sufficiently 'outrageous.'" *Hustler Magazine*, 485 U.S. at 53.

¶14    But when speech involves a matter of public concern, the balance changes significantly. "[I]n the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment." *Id*. When speech is about a matter of public concern, state tort law alone cannot place the speech outside the protection of the

First Amendment. *See id*. (stating that although the intent to inflict emotional distress "may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate"). This is because "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Id*. at 50; *accord Dun & Bradstreet,* 472 U.S. at 758-59 ("[S]peech on matters of public concern . . . is at the heart of the First Amendment's protection.") (internal quotation marks omitted).

¶15     Even when speech involves matters of public concern, the protections afforded by the First Amendment are not absolute.[2]  But those seeking to impose liability for speech about matters of public concern — so-called "political speech" — must establish some "exception to . . . general First Amendment principles." *Hustler Magazine*, 485 U.S. at 56.  "[P]olitical speech . . . may not be punished or enjoined unless it falls into one of the narrow categories of unprotected speech

---

[2]     As *New York Times* recognized, even speech about public officials can be the proper subject of a defamation suit when made with "'actual malice'-that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  376 U.S. at 279-80; *see*, *e.g.*, *Goldwater v. Ginzburg*, 414 F.2d 324 (2nd Cir. 1969) (upholding libel verdict for United States senator and presidential nominee under "actual malice" standard).

recognized by the Supreme Court." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1092 (9th Cir. 2002) (Kozinski, J., dissenting).

**B.**

¶16    The letter to the editor upon which Plaintiffs' complaint is based involves a matter of undeniable public concern — the war in Iraq. Thus, the question is whether the letter to the editor in this case fell within one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). Only three such exceptions to the general rule of First Amendment protection of political speech have been suggested in this case. The trial court held that the speech at issue here was not protected because it could incite imminent lawless action. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (recognizing that First Amendment protection does not extend to advocacy that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Plaintiffs argue alternatively that the statement at issue here constituted either "fighting words," *see Chaplinksy*, 315 U.S. at 572 (allowing state law to punish "insulting or 'fighting' words"), or a "true threat," *see Virginia v. Black*, 538 U.S. 343, 359 (2003) ("[T]he First Amendment also permits a

10

State to ban a true threat.") (internal quotation marks omitted); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("[T]hreats of violence are outside the First Amendment."). We analyze each of these contentions in turn.

## 1.

¶17    The seminal case addressing the "incitement" exception is *Brandenburg*, which arose out of a speech at a Ku Klux Klan rally. 395 U.S. at 444-45. In that speech, Brandenburg criticized Blacks and Jews and threatened "revengeance" if the "suppression" of the white race continued. *Id*. at 445-47. He was convicted of violating Ohio's Criminal Syndicalism Act, which prohibited advocacy of "crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform." *Id*. at 444-45.

¶18    The Supreme Court reversed the conviction, holding that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id*. at 447. In holding that Brandenburg's speech did not fall within this limited incitement exception, the Court emphasized that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the

11

same as preparing a group for violent action and steeling it to such action." *Id*. at 448 (quoting *Noto v. United States*, 367 U.S. 290, 297-98 (1961)).

¶19    In order to qualify as incitement under the *Brandenburg* test, challenged speech must not only be aimed at producing "imminent lawless action" but must also be "likely" to do so. *Id*. at 447. In applying that test, courts must employ "careful consideration of the actual circumstances surrounding" the challenged speech, and recognize that not "every expression of a provocative idea will incite a riot." *Texas v. Johnson*, 491 U.S. 397, 409 (1989).

¶20    The Supreme Court has made plain that very few statements will meet this demanding test. *Claiborne Hardware* is particularly instructive in this regard. That case arose out of the 1960s civil rights movement and involved a boycott of white merchants in Mississippi. *Claiborne Hardware*, 458 U.S. at 888-89. A number of the affected merchants filed suit against the NAACP and various individuals to recover losses and to enjoin the boycott. *Id*. at 889-90. The record showed that Charles Evers, an official of the NAACP, had stated in various speeches that the boycott organizers knew the identity of Blacks who had violated the boycott, *id*. at 900 n.28, and intended to take action against them, *id*. at 902. Evers stated that "[i]f we catch any of you going into any of them racist stores, we're

going to break your damn neck," and that the sheriff would be unable to protect boycott violators. *Id.*

¶21    The trial court awarded the merchants damages and injunctive relief. *Id.* at 890-93. The Mississippi Supreme Court affirmed portions of the trial court's judgment and expressly rejected the NAACP's First Amendment defense. *Id.* at 894-95.

¶22    The Supreme Court reversed. It began from the premise that because the merchants sought to "impose liability on the basis of a public address—which predominantly contained highly charged political rhetoric lying at the core of the First Amendment—we approach this suggested basis for liability with extreme care." *Id.* at 926-27. The Court then considered whether Evers' statements qualified as incitement under the *Brandenburg* test. Even though isolated instances of violence occurred after Evers' "emotionally charged rhetoric," the Court concluded that "Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*." *Id.* at 928. The Court noted that the acts of violence occurred long after the challenged speech and that the speech did not therefore carry with it an imminent threat of violence. *Id.*

¶23    Measured against the Supreme Court's precedents, the speech at issue in this case falls far short of unprotected incitement. The suggestion in the letter to the editor that the

13

intentional murder of innocent civilians is an appropriate response to the deaths of American soldiers is no doubt reprehensible, and Plaintiffs' allegation that publication of the letter caused them and other members of the Islamic community considerable apprehension has much force. But, however offensive, the letter did not advocate "imminent lawless action." The suggestion that "we" execute Muslims was premised on the occurrence of some future "assassination or another atrocity." Nor were the words likely to produce imminent lawless action. The statement was made in a letter to the editor, not before an angry mob. Indeed, the complaint was filed more than a month after the challenged statements were made and did not allege that a single act of violence had ensued from the publication nor that such violence was imminent. Rather, the only thing that appears to have resulted from the challenged speech was *more* speech, in the form of numerous critical letters to the editor, including one from one of the Plaintiffs. This is precisely what the First Amendment contemplates in matters of political concern – vigorous public discourse, even when the impetus for such discourse is an outrageous statement. *See Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert

14

the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.").

**2.**

**¶24** "Fighting words" are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California,* 403 U.S. 15, 20 (1971). Such words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572. Fighting words must be "directed to the person of the hearer." *Cohen*, 403 U.S. at 20 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940)). The fighting words doctrine has generally been limited to "face-to-face" interactions. *See, e.g., Chaplinsky*, 315 U.S. at 573 ("The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee."); *Gooding v. Wilson*, 405 U.S. 518, 523-24 (1972) (holding unconstitutional a Georgia statute that lacked the limitations of the statute in *Chaplinsky*).

**¶25** This case does not fall within the fighting words exception to the First Amendment. The statements at issue were made in a letter to the editor, not in a face-to-face confrontation with the target of the remarks. While the letter expresses controversial ideas, it contains no personally abusive

words or epithets.  The letter is neither directed toward any particular individual nor likely to provoke a violent reaction by the reader against the speaker.

**3.**

¶26    The remaining question is whether the letter constituted a "true threat."  The true threat doctrine had its genesis in *Watts v. United States*, 394 U.S. 705 (1969).  The defendant in that case had spoken at a public rally protesting the Vietnam War.  *Id*. at 706.  He noted that he had been ordered to report for a draft physical and stated:  "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."  *Id*.  Watts was thereafter convicted for violating a federal law prohibiting threats against the president, and the conviction was upheld on appeal.  *Id*. at 705.

¶27    The Supreme Court reversed, holding that "the kind of political hyperbole indulged in by petitioner" was not the kind of true threat forbidden by the statute.  *Id*. at 708.  Although the Court based its decision on an interpretation of the federal statute, it made it clear that First Amendment principles informed its conclusion, remarking that any statute "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind."  *Id*. at 707.  Given the "expressly conditional nature of the statement" and the absence of violent reaction by listeners, the Court did not

believe that the statement could be interpreted as anything but "a kind of very crude offensive method of stating a political opposition to the President." *Id*. at 708.

¶28    The Supreme Court most recently revisited the true threat doctrine in *Virginia v. Black*, which dealt with a Virginia law prohibiting cross burning with the intent to intimidate. 538 U.S. at 348. In holding that cross burnings committed with an intent to intimidate could be constitutionally prohibited, the Court explained the true threat doctrine as follows:

> 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.

*Id*. at 359-60 (internal quotation marks and citations omitted). The Court then explained that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id*. at 360.

¶29    Our court of appeals has adopted a substantially similar test for determining a "true threat" under the First

17

Amendment. *In re Kyle M.* involved the interpretation of A.R.S. § 13-1202(A)(1), which proscribes "threatening" or "intimidating." 200 Ariz. 447, 448 ¶ 1, 27 P.3d 804, 805 (App. 2001). The court of appeals recognized that the dictionary definition of "threaten" could encompass some constitutionally protected speech. *Id*. at 450-51 ¶¶ 18-19, 27 P.3d 807-08. Therefore, to avoid constitutional conflict, the court interpreted "threat" in the statute as concurrent with the true threat doctrine. *Id*. at 451 ¶ 22, 27 P.3d at 808. Relying on "[c]ases decided since *Watts*," the court determined that "true threats" are those statements made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of [a person]." *Id*. at 451 ¶ 21, 27 P.3d 808 (quoting *United States v. Khorrami,* 895 F.2d 1186, 1192 (7th Cir. 1990)).

¶30    Thus, as in the case of incitement, the presence of a true threat can be determined only by looking at the challenged statement in context. *See Black*, 538 U.S. at 345 (holding that consideration of "all of the contextual factors" is "necessary to decide whether a particular cross burning is intended to intimidate"); *Watts*, 394 U.S. at 708 ("Taken in context, and regarding the expressly conditional nature of the statement and

18

the reaction of the listeners," challenged statement was not a true threat, but rather "political hyperbole."). A difference in context may be critical in determining if speech is protected: there is a vast constitutional between falsely shouting fire in a crowded theater and making precisely the same statement in a letter to the editor.

¶31    Given both the content and the context of the statement at issue here, we conclude that it is not a constitutionally proscribable true threat. First, the letter involved statements with a plainly political message. Indeed, the comments arose in the context of a discussion about a central political issue of the day: the conduct of the war in Iraq. Such statements are far less likely to be true threats than statements directed purely at other individuals. *See Watts*, 394 U.S. at 706 (finding no true threat when statement involved issues of current public debate); *cf*. *United States v. Orozco-Santillan*, 903 F.2d 1262, 1266 (9th Cir. 1990) ("Although a threat must be 'distinguished from what is constitutionally protected speech' this is not a case involving statements with a political message.") (internal citation omitted).

¶32    Second, this expression occurred in the letters to the editor section of a general circulation newspaper, hardly a traditional medium for making threats, and a public arena dedicated to political speech. Speech that is part of this sort

of public discourse is far less likely to be a true threat than statements contained in private communications or in face-to-face confrontations. *See, e.g.*, *Melugin v. Hames*, 38 F.3d 1478, 1484-85 (9th Cir. 1994) (distinguishing threat communicated to judge by mail from threat made in *Watts* at a public rally); *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1222 (9th Cir. 1990) (stating that "public speeches advocating violence" are entitled to more First Amendment protection than "privately communicated threats of violence").

¶33    Third, the action "threatened" in the letter was that "we" should take deadly measures in response to *future* assassinations and other atrocities. The letter is unclear as to whom "we" refers – it could be read as referring to the United States armed forces or to the public at large. It is similarly unclear whether the letter advocates violence against Muslims in Iraq, against Muslims worldwide, or against Muslims in Tucson. Given the letter's conditional nature and ambiguity, we do not believe that a reasonable person could view that letter as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359.

## IV.

¶34    In short, we conclude that this letter does not fall within one of the well-recognized narrow exceptions to the

20

general rule of First Amendment protection for political speech. It therefore follows that the *Citizen* cannot be held liable under Arizona tort law for publishing this letter. The superior court erred in not dismissing the Plaintiffs' claim for intentional infliction of emotional distress, and we remand this case to the superior court with instructions to dismiss that portion of the complaint with prejudice.[3]

_____

Andrew D. Hurwitz, Justice

CONCURRING:

_____

Ruth V. McGregor, Chief Justice

_____

Rebecca White Berch, Vice Chief Justice

---

[3] The *Citizen* also claims that the publication of the letter is protected by the Arizona Constitution's "even greater protection for freedom of the press than the First Amendment['s]." Article 2, Section 6 of the Arizona Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Given our conclusion that tort liability for the publication of this letter is prohibited by the federal constitution, we need not decide today whether the state constitution provides "even greater protection." *See Petersen v. City of Mesa*, 207 Ariz. 35, 37 ¶ 8 n.3, 83 P.3d 35, 37 n.8 (2004) (stating that a showing of a violation of the federal constitution "obviates the need to consider whether the protections granted by the Arizona Constitution extend beyond those" of the federal constitution).

_____
Michael D. Ryan, Justice


_____
Charles E. Jones, Justice (Retired)