IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ANGELA RODRIGUEZ, as the parent and guardian of JoDon R., Jr.,
Frank R., and Noah R., Minors, *Plaintiff/Appellant*,

*v.*

FOX NEWS NETWORK, L.L.C., a foreign limited liability company,
*Defendant/Appellee*.

No. 1 CA-CV 14-0437
FILED 8-4-2015

Appeal from the Superior Court in Maricopa County
No.  CV2013-008467
The Honorable John Christian Rea, Judge

**AFFIRMED**

COUNSEL

Robbins & Curtin, PLLC, Phoenix
By Joel B. Robbins, Anne E. Findling
*Co-Counsel for Plaintiff/Appellant*

Knapp & Roberts, PC, Scottsdale
By David L. Abney
*Co-Counsel for Plaintiff/Appellant*

Ballard Spahr, LLP, Phoenix
By David J. Bodney, Christopher Moeser
*Counsel for Defendant/Appellee*

**OPINION**

Judge Diane M. Johnsen delivered the opinion of the Court, in which Presiding Judge Patricia K. Norris and Judge Kent E. Cattani joined.

**J O H N S E N**, Judge:

¶1        An armed carjacking suspect led police on a high-speed chase that ended abruptly when he got out of the vehicle, put a handgun to his head and shot himself. After Fox News Networks, LLC, broadcast the chase and the suicide live, the two teenage sons of the suspect learned their father had killed himself when they saw a clip of the broadcast on the Internet a few hours later. Their mother sued Fox on their behalf, alleging negligent and intentional infliction of emotional distress. The superior court granted Fox's motion to dismiss. Because the First Amendment bars the tort claims, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        After stealing a car at gunpoint in west Phoenix, JoDon Romero led police on an 80-mile chase, at one point firing gunshots at officers in pursuit. He made his way to Interstate 10, then weaved in and out of traffic at speeds reportedly exceeding 100 miles an hour before pulling off the freeway near Salome. Several news organizations covered the chase. The local Fox affiliate videotaped it from a news helicopter, and Fox aired the video live during a national broadcast of *Studio B with Shepard Smith*. Although Fox's normal practice is to use a short video delay that allows it to cut away from a violent scene, it did not do so here, and viewers saw Romero fire the handgun and crumple to the ground. The Fox anchor immediately apologized for showing the suicide.

¶3        Romero was the father of three boys who were in school during the incident. After hearing at school about a suicide video, and unaware it involved their father, the two older boys searched for the video online when they got home. They found a clip of the Fox newscast on YouTube, and as they watched, they realized the carjacking suspect who shot himself was their father.

¶4        Angela Rodriguez, their mother, sued Fox on behalf of the boys, alleging the video severely traumatized them. Fox moved to dismiss, arguing, *inter alia*, that the First Amendment protected it from liability. The

superior court granted the motion. We have jurisdiction of the timely appeal pursuant to Arizona Revised Statutes section 12-2101(B) (2015).[1]

## DISCUSSION

### A. Standard of Review.

**¶5** We review *de novo* the dismissal of a complaint for failure to state a claim, *Coleman v. City of Mesa*, 230 Ariz. 352, 355, ¶ 7 (2012), and will affirm only if a plaintiff "would not be entitled to relief under any facts susceptible of proof in the statement of the claim," *Mohave Disposal, Inc. v. City of Kingman*, 186 Ariz. 343, 346 (1996). In determining whether a complaint states a claim upon which relief can be granted, we "assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom." *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 7 (2008).

**¶6** A complaint that implicates freedom of the press under the First Amendment, however, requires close scrutiny. *AMCOR Inv. Corp. v. Cox Ariz. Publ'ns, Inc.*, 158 Ariz. 566, 568 (App. 1988) ("[W]hen the complaint implicates the fundamental value of freedom of the press, there is good reason for a court to examine the complaint with a more rigorous eye in order not to burden public debate with insupportable litigation."). Close review of such a complaint advances "the public's significant interest in protecting the press from the chill of meritless . . . actions." *Scottsdale Publ'g Inc. v. Superior Court*, 159 Ariz. 72, 74 (App. 1988).

### B. The First Amendment Defense to Claims for Intentional or Negligent Infliction of Emotional Distress.

**¶7** The tort of intentional infliction of emotional distress requires proof of the following elements:

> *[F]irst,* the conduct by the defendant must be "extreme" and "outrageous"; *second,* the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and *third,* severe emotional distress must indeed occur as a result of defendant's conduct.

---

[1] Absent material revision after the date of the events at issue, we cite a statute's current version.

*Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987). The tort of negligent infliction of emotional distress requires a showing that the plaintiff witnessed an injury to a closely related person, suffered mental anguish manifested as physical injury, and was within the zone of danger so as to be subjected to an unreasonable risk of bodily harm created by the defendant. *Pierce v. Casas Adobes Baptist Church*, 162 Ariz. 269, 272 (1989).

**¶8** We assume *arguendo* that the complaint stated these common-law claims. Like the superior court, we will address Fox's constitutional defense so as to protect First Amendment rights and avoid a "prolonged, costly, and inevitably futile trial." *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 516, ¶ 9 (2005) (quoting *Scottsdale Publ'g*, 159 Ariz. at 74).

**¶9** The First Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, "can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *see, e.g.*, *Citizen Publ'g Co.*, 210 Ariz. at 517, ¶ 12. In *Snyder*, the Supreme Court addressed speech that, like the broadcast here, had the power to "inflict great pain." 562 U.S. at 461. Members of a church used the occasion of the funeral of a young Marine to picket with signs reflecting their "view that the United States is overly tolerant of sin and that God kills American soldiers as punishment." *Id.* at 447. Acknowledging that the signs were "particularly hurtful" to the mourners, *id.* at 456, the Court nevertheless held the First Amendment protected the church members from state tort claims because their speech was a matter of public concern, *id.* at 461.

**¶10** Speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988). Speech involving purely private matters, by contrast, receives less First Amendment protection. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985). "That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: '[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas'; and the 'threat of liability' does not pose the risk of 'a reaction of self-censorship' on matters of public import." *Snyder*, 562 U.S. at 452 (quoting *Dun & Bradstreet*, 472 U.S. at 760).

¶11          In *Snyder*, the Court observed that the principles determining when speech is of public concern "accord broad protection to speech to ensure that courts themselves do not become inadvertent censors." 562 U.S. at 452. The Court continued:

> Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."

*Id.* at 453 (citations omitted). The Court explained that determining "whether speech is of public or private concern requires us to examine the 'content, form and context' of that speech, 'as revealed by the whole record.'" *Id.* (quoting *Dun & Bradstreet*, 472 U.S. at 761). In this analysis, a court must independently examine the entire record "to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Id.* (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)).

¶12          Applying that analysis here, the Fox broadcast clearly addressed a matter of public concern. The "content" of the broadcast depicted a police chase of an armed suspect who had fired at officers and demonstrated great disregard for the safety of others. The public has a strong interest in monitoring the manner in which law enforcement responds to criminal behavior. *See, e.g., Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 343 (1989) ("It is difficult to conceive of an area of greater public interest than law enforcement. Certainly the public has a legitimate interest in the manner in which law enforcement officers perform their duties."). Moreover, Romero's crimes themselves were "events of legitimate concern to the public." *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975). And his flight, as he swerved in and out of freeway traffic at high speeds, posed an immediate and ongoing threat to public safety. *See, e.g., Plumhoff v. Rickard*, ____ U.S. ____, 134 S. Ct. 2012, 2021 (2014) (criminal suspect's "outrageously reckless driving posed a grave public safety risk").

¶13          As for "context" and "form," Fox broadcast the chase and the suicide during a news program and, as with the picketing at issue in *Snyder*, there is nothing to suggest that the speech was intended to mask a personal attack or otherwise was "contrived to insulate speech on a private matter from liability." *See* 562 U.S. at 455.

¶14        Rodriguez concedes that the police chase was newsworthy. She argues, however, that the few seconds at the end of the video that depicted Romero's death concerned a purely private matter not entitled to First Amendment protection.  But the newscast did not merely depict a suicide; it covered a police chase that ended in a suicide.  In this context, under *Snyder*, whether speech is a matter of public concern requires "examination of the whole record" of the broadcast.  562 U.S. at 453. Without doubt, "the overall thrust and dominant theme" of the coverage addressed important matters of public concern.  *See id.* at 454; *cf. Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248 (2002) ("[T]he First Amendment requires that redeeming value be judged by considering the work as a whole.  Where the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive."); *The Florida Star v. B.J.F.*, 491 U.S. 524, 536-37 (1989) ("It is, clear, furthermore, that the news article concerned 'a matter of public significance' . . . .  That is, the article generally, as opposed to the specific identity contained within it, involved a matter of paramount public import: the commission, and investigation, of a violent crime which had been reported to authorities.") (citation omitted).

¶15        Rodriguez further argues the First Amendment does not shield the broadcast of the suicide because Fox could have used a tape delay to cut away before Romero shot himself.  She argues that given the nature of the chase, during which Romero had shot at others, and Romero's erratic behavior after he exited the car, Fox should have suspected he might try to kill himself and should have been on alert to cut away before he did so.

¶16        As noted, the Fox news anchor apologized at the time for failing to cut away before the suicide, and on appeal, Fox expresses regret over the incident.  But no authority supports Rodriguez's argument that a broadcast whose "overall thrust and dominant theme" is a matter of public concern loses First Amendment protection if the broadcaster does not terminate the broadcast when it suspects violence may occur, or fails to use a tape delay to prevent airing of a violent scene after it has occurred. Requiring a broadcaster covering a matter of public concern to cut away whenever a violent or disturbing sight may be caught on camera, or to avoid broadcasting such a scene by use of a split-second tape delay, would chill the broadcaster's news coverage to a degree the First Amendment does not permit.  *See, e.g., Boos v. Barry*, 485 U.S. 312, 322 (1988) (we "tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment"); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777-78 (1986) (rule requiring media defendant in defamation case to prove truth of statement

of public concern would unduly chill First Amendment rights); *New York Times v. Sullivan*, 376 U.S. 254, 270-72 (1964) (First Amendment provides "breathing space" to ensure that discourse on public issues remains "uninhibited, robust, and wide-open").

¶17        Rodriguez cites cases in which other courts have rejected requests by the press for access to government photographs of death scenes. She argues those cases establish that "the actual depiction of a person's death rarely, if ever, serves any legitimate First Amendment purpose." *See, e.g.*, *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) (photos of suicide scene); *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) (child's autopsy photos); *Melton v. Bd. of County Comm'rs*, 267 F. Supp. 2d 859 (S.D. Ohio 2003) (government morgue); *Catsouras v. Dep't of Cal. Highway Patrol*, 104 Cal. Rptr. 3d 352 (Cal. App. 2010) (photos of corpse). Those decisions concern the press's right to receive copies of documents or other information in the possession of government. Here, Fox possessed the information; the question is whether, consistent with the First Amendment, the broadcaster may be liable for civil damages for publishing it, an issue not addressed in the cases Rodriguez cites.

¶18        Rodriguez's reliance on cases addressing the news media's right of access to government proceedings similarly is misplaced. *See, e.g.*, *Garrett v. Estelle*, 556 F.2d 1274 (5th Cir. 1977) (reversing order allowing journalist to film execution); *In re The Spokesman-Review*, 569 F. Supp. 2d 1095 (D. Idaho 2008) (denying media request to be present during trial testimony by minor victim of sexual assault). These cases turn on the principle that the First Amendment does not guarantee the press special access to information that is not generally available to the public. *See Garrett*, 556 F.2d at 1277. That principle, and the cases Rodriguez cites, do not apply when the press has gained access to information through lawful means, as in this case. *Cf. Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) (state could not punish newspapers for publishing name of juvenile offender, in violation of state law, when they had learned juvenile's name through lawful means); *Okla. Publ'g Co. v. Dist. Court*, 430 U.S. 308 (1977) (reversing order barring press from publishing name of 11-year-old criminal suspect; even though, under state law, juvenile proceedings generally are closed, reporters learned name of suspect when attending juvenile's hearing without objection from any party).[2]

---

[2]      Rodriguez's citation of *KOVR-TV, Inc. v. Superior Court*, 37 Cal. Rptr. 2d 431 (Cal. App. 1995), and *Miller v. Nat'l Broad. Co.*, 232 Cal. Rptr. 668 (Cal.

¶**19**    Finally, Rodriguez cites *Green v. Chicago Tribune Co.*, 675 N.E.2d 249, 255 (Ill. App. 1996), which reversed a trial court's dismissal of tort claims against a newspaper that allegedly published photographs of a patient taken during emergency surgery and printed the dying patient's mother's last words to him, all without consent.  The events in that case occurred in the privacy of a hospital room, not, as here, in public view.  Moreover, even assuming the Illinois case might apply to these very different circumstances, we are not persuaded by that court's reasoning because it fails to give due respect to established First Amendment principles.

## CONCLUSION

¶**20**    Because the Fox broadcast addressed a matter of public concern, the First Amendment bars the claims for intentional and negligent infliction of emotional distress.  We affirm the superior court's order dismissing the complaint.



Ruth A. Willingham · Clerk of the Court
F I L E D : RT

---

App. 1986), likewise is of no avail.  Unlike the news organizations in those cases, Fox did not intrude a private space, but merely broadcast the events as they unfolded in public.