IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

PHOENIX NEWSPAPERS, INC.; MEREDITH CORPORATION dba
KPHO-TV, and KTVK-3TV; KPNX-TV CHANNEL 12, A DIVISION OF
MULTIMEDIA HOLDINGS CORPORATION; and THE ASSOCIATED
PRESS, *Petitioners*,

*v.*

THE HONORABLE ERIN OTIS, Judge of the SUPERIOR COURT OF THE
STATE OF ARIZONA, in and for the County of MARICOPA, *Respondent
Judge*,

STATE OF ARIZONA and JOHN MICHAEL ALLEN, *Real Parties in
Interest.*

No. 1 CA-SA 17-0286
FILED 1-23-2018

Petition for Special Action from the Superior Court in Maricopa County
No. CR2011-138856-001 DT
The Honorable Erin Otis, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED IN PART**

COUNSEL

Ballard Spahr LLP, Phoenix
By David J. Bodney, Craig C. Hoffman, Chase A. Bales
*Counsel for Petitioners*

Maricopa County Attorney's Office, Phoenix
By Gerald R. Grant
*Counsel for Real Party in Interest State of Arizona*

---

## OPINION

Presiding Judge Lawrence F. Winthrop delivered the opinion of the Court, in which Judge Diane M. Johnsen and Judge Maria Elena Cruz joined.

---

**W I N T H R O P**, Presiding Judge:

¶1 Phoenix Newspapers, et al. ("Petitioners") are a group of news agencies covering the prosecution of John Michael Allen, a high-profile murder case in which the State is seeking the death penalty. In this special action, Petitioners challenge the superior court's order temporarily precluding Petitioners from disseminating the name or likeness of the lead prosecutor.[1] Petitioners argue the order is an impermissible prior restraint. For the following reasons, we agree and accept jurisdiction, granting the limited relief ultimately sought by Petitioners.

## FACTS AND PROCEDURAL HISTORY

¶2 The Allen murder trial began on October 9, 2017.[2] During a recess in the trial on October 25, the prosecutor, Jeannette Gallagher,

---

[1] Petitioners' special action petition challenges only the prohibition on the use of the prosecutor's name in media coverage of the trial, and does not challenge that part of the court's order limiting camera coverage of the prosecutor.

[2] That same day, the court received a request from 3TV/CBS 5 News to live stream or, alternatively, use a still camera to record the trial. *See* Ariz. R. Sup. Ct. 122. Both the prosecutor and defense counsel objected, and the court set a hearing for October 12. When no media representative appeared at the hearing, the court denied the live streaming request and found the still camera request to be "abandoned as it relates to the entire trial," although the court indicated it would entertain a motion to reconsider. 3TV/CBS 5 News made no additional requests.

testified as an alleged victim of stalking in the separate and unrelated trial of Albert Karl Heitzmann.[3]

¶3        On October 30, the first day evidence was to be taken in the Allen trial, the Arizona Republic submitted a request to use a still camera in court during the trial, but both the prosecutor and defense counsel again objected. The prosecutor, Gallagher, referenced the stalking trial, asking the court to ensure the media "not cover this until [the Heitzmann] trial is over because I certainly don't want to see it affect that jury and have me as a victim have to go through that trial again." The court denied the newspaper's request as untimely, noting that any request to use a camera in court must by rule be made seven calendar days before the trial date. *See* Ariz. R. Sup. Ct. 122(c)(2)(A). The court, however, went on to rule that the newspaper could use a still camera in the courtroom beginning seven days from the date of the filing of the request, meaning November 6. In making its ruling, the court did not reference Gallagher's request.

¶4        On the morning of November 6—which turned out to be the last day evidence was presented in the guilt phase of the Allen trial—the court again addressed the newspaper's still camera request. After noting that both the prosecution and defense had objected to media coverage of the trial, the court ruled that it would allow the still camera in the courtroom. However, after further noting Gallagher was an alleged victim in the Heitzmann trial, which by then had proceeded to the jury deliberations stage, the court, perhaps in furtherance of Gallagher's previous request, temporarily barred the media from disseminating her name and likeness:

> [A]t least until further notice, I need the media and I'm ordering that the media not to be able to film Ms. Gallagher or indicate her name in the -- any coverage, whether it be video and/or news coverage of this case just until further

---

[3]        Heitzman's stalking trial began on October 24, 2017. The judge in that case imposed limitations on what the jury could be told about Gallagher's employment, only allowing testimony that she was employed by the Maricopa County Attorney's Office, and not allowing testimony that she prosecuted capital cases or that she was the Bureau Chief of her office's Capital Litigation Bureau. The jury began deliberating on October 31, but took a recess and did not resume until November 7.

> notice and that is because at this point in time there is a pending case in court where Ms. Gallagher is a victim.

The court explained that the court in the Heitzmann trial had barred the jury in that case from hearing evidence about the types of cases Gallagher handled, including that she prosecuted capital murder cases. The court expressed its "need to stick to that [judge's] order," and stated that the restrictions it imposed were "something that can change once that trial has come to completion." The court further explained that it did so to protect the rights of the defendants (Allen and Heitzmann) and any victims, and so the "sanctity of those trials is protected."

¶5 Neither the prosecutor nor defense counsel commented regarding the ruling; however, Petitioners' counsel, who was present, objected. Petitioners' counsel argued the restriction on using the prosecutor's name was an unconstitutional prior restraint on the press and that the court should consider less restrictive measures. The court overruled the objection, reiterating that its order was temporary, the rights of the two defendants and the victim were "of the most concern to [the court] at this point," and the court wanted to ensure "that we don't affect two separate trials." The court concluded, "If there's a verdict today and [the Heitzmann trial] is concluded today, then as of tomorrow you will be able to write about [the prosecutor]."[4]

---

[4] The State argues the court's order expired upon conclusion of the Heitzmann trial, and we agree; however, the court did not memorialize its order in the minute entry it issued at the close of trial proceedings on November 6, except to note that it had ruled on the request for media coverage "with specific conditions as stated on the record." Thus, the scope and particulars of the order can be gleaned only by carefully analyzing the court's statements over several pages of a transcript. To avoid ambiguity and create a clear record, the superior court should have plainly and concisely made findings, including findings concerning any less restrictive alternatives, and memorialized its ruling and those findings in a written minute entry. At the same time, Petitioners and/or the parties could have submitted a formal order for the court's review and signature concerning the court's findings, the conditions imposed, and the duration of any limitations, but they did not do so.

**¶6** The jury in the Heitzmann trial returned guilty verdicts on November 7, and the aggravation phase of that trial concluded the next day.[5] The jury in the Allen trial returned guilty verdicts on November 8.[6]

**¶7** On November 9, Petitioners moved to vacate or clarify the November 6 order. The court's public information officer informed Petitioners via e-mail on Monday, November 13, that they were "free to use the prosecutor's name." The court, however, did not issue a formal order to that effect or rule on Petitioners' motion to vacate or clarify the November 6 order.

**¶8** On November 15, 2017, Petitioners filed a petition for special action, asking this court to hold the superior court's order was an unconstitutional prior restraint on their coverage of the Allen trial.

## ANALYSIS

*I. Jurisdiction*

**¶9** We accept special action jurisdiction because Petitioners have no equally plain, speedy, and adequate remedy by appeal, and they assert the superior court abused its discretion or proceeded in excess of its legal authority. *See* Ariz. R.P. Spec. Act. 1(a), 3(b)-(c). Further, this dispute involves a legal question of statewide importance. *See City of Phoenix v. Superior Court (Laidlaw Waste Sys., Inc.)*, 158 Ariz. 214, 216 (App. 1988).

**¶10** The State does not challenge Petitioners' standing to bring this request, and we conclude standing exists. *See* U.S. Const. amend. I; Ariz. Const. art. 2, §§ 6, 11; Ariz. R. Crim. P. 9.3(b); *KPNX Broad. Co. v. Superior Court*, 139 Ariz. 246, 249 (1984); *see also Phoenix Newspapers, Inc. v. U.S. Dist. Court*, 156 F.3d 940, 952 (9th Cir. 1998) (stating that because media members lack standing to bring a direct appeal, they must rely on a petition for writ of mandamus to seek review of orders denying them access to

---

[5] On November 7, the jury found Heitzmann guilty of one count of stalking causing the victim reasonable fear of death, and one count of stalking causing the victim to fear physical injury. The next day, the jury found the presence of two aggravating circumstances as to each count.

[6] The jury found Allen guilty of first degree murder, conspiracy to commit child abuse, two counts of intentional or knowing child abuse, and reckless child abuse. The jury also found the victim was under the age of fifteen. On November 16, the jury found Allen should be sentenced to death.

judicial documents or proceedings); *Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1464 (9th Cir. 1990) (same); *cf. Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 516, ¶ 8 (2005) ("There is good reason to [accept special action jurisdiction] when a suit raises serious First Amendment concerns.").

**¶11** Finally, even if, as the State argues, the superior court's November 6 order became moot once the Heitzmann stalking trial ended, "jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.'" *KPNX Broad. Co.*, 139 Ariz. at 250 (quoting *Neb. Press Ass'n et al. v. Stuart*, 427 U.S. 539, 546 (1976) (quoting *S. Pac. Terminal Co. v. I.C.C.*, 219 U.S. 498, 515 (1911))). Because criminal trials are often of short duration, orders restricting media coverage of such trials often would evade review absent special action jurisdiction. *Id.* Accordingly, neither the conclusion of the Heitzmann trial nor the e-mail from the superior court's public information officer moots this special action.

## II. The Merits

**¶12** As they did in the superior court, Petitioners argue the court's November 6 order was an impermissible prior restraint in violation of the First Amendment and the Arizona Constitution, and that the court failed to consider less restrictive options before issuing its order. We review *de novo* the lawfulness of the superior court's order. *See Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 253-54, ¶ 10 (2003).

**¶13** "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559; *accord Near v. Minn. ex rel. Olson*, 283 U.S. 697, 713 (1931) ("[I]t has been generally, if not universally, considered that it is the chief purpose of the [First Amendment] to prevent previous restraints upon publication."); *see also Phoenix Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 259 (1966) ("The words of [Article 2, Section 6, of] the Arizona Constitution are too plain for equivocation. The right of every person to freely speak, write and publish may not be limited but such a person may be held accountable for an abuse of that right. There can be no censor appointed to whom the press must apply for prior permission to publish . . . .").

**¶14** Moreover, the temporary nature of a restraint does not make it less objectionable or reduce the burden on the government to justify it. *Neb. Press Ass'n*, 427 U.S. at 559. Thus, "any order prohibiting the

publication or broadcast of certain information [is subject] to a 'heavy presumption against its constitutional validity.'" *KPNX Broad. Co.*, 139 Ariz. at 251 (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)).

**¶15** In evaluating the propriety of a prior restraint, we consider three factors: (1) the nature and extent of the harm sought to be avoided; (2) whether measures short of a prior restraint would adequately protect against that harm; and (3) how effectively the restraint would operate to prevent the threatened harm. *See Neb. Press Ass'n*, 427 U.S. at 562, *adopted in KPNX Broad. Co.*, 139 Ariz. at 251.

**¶16** First, what was the nature and extent of the harm sought to be avoided by the order? The State has an undeniable interest in protecting the rights of defendants to a fair trial, as well as in protecting a crime victim's right to a prompt and speedy resolution of his or her case. *See, e.g.*, U.S. Const. amend. VI, XIV; Ariz. Const. art. 2, §§ 2.1(A)(10), 24. The court recognized those interests when it noted the possibility that revealing the identity of the prosecutor in media coverage of the Allen trial could affect the jury's deliberations in the unrelated stalking trial, thus potentially negatively affecting the rights of both Heitzmann, the defendant in the stalking trial, and Gallagher, the alleged victim in that trial. In court on November 6, neither the court nor the parties identified any specific harm that might occur absent the order. The court, however, seemingly was concerned that jurors in the stalking trial would see coverage of the Allen murder trial, that they would recognize Gallagher as the victim in their case, and that they would allow that information to affect their decision making, notwithstanding the standard instruction the court gave them to base their verdicts solely on the evidence. Although we agree with the State that the nature and extent of the harm were potentially significant, and clearly the judge in the Heitzmann trial had decided the precluded information was significant enough to bar the jury from hearing it, we also agree with Petitioners that the potential harm was simply too speculative to satisfy the constitutional burden imposed on a prior restraint. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (declining to rely on speculative predictions as grounds justifying a prior restraint); *United States v. Noriega*, 752 F. Supp. 1045, 1054 (S.D. Fla. 1990) ("If nothing else, *Nebraska Press* stands for the proposition that speculative harm falls well short of the showing necessary for the imposition of a prior restraint." (citing *Neb. Press Ass'n*, 427 U.S. at 569)).

**¶17** Second, could measures short of a prior restraint have adequately protected against the risk of harm? It appears from the court's comments that the court was primarily concerned about jurors in the

Heitzmann trial inadvertently learning that the alleged victim in that case was a capital prosecutor.[7] On this record, we do not know what less restrictive measures the court in the Heitzmann trial had already taken to bar the jury from learning of such information, but if that court considered the information potentially harmful, we presume it would have already fashioned a means to preclude that jury from otherwise learning of it, such as admonishing the jurors to avoid all media coverage of any pending case until they had completed their service.[8] Further, the Heitzmann court could have instructed its jurors that any knowledge of the specific types of cases handled by Gallagher was to have no impact on their deliberations. In other words, to the extent the court in the Heitzmann trial was concerned about that jury learning Gallagher was a capital-case prosecutor, it was up to that court, in the first instance, to fashion a means of preventing that jury from learning that information.

¶18 We understand the Allen court's concern that unlimited coverage of the murder trial might expose jurors in the Heitzmann trial to information that could damage Heitzmann's right to a fair trial and Gallagher's right as a crime victim to a prompt and speedy resolution of that other case. This concern arguably became heightened because the Heitzmann jurors possibly were more likely to see or hear media coverage of the Allen trial during the recess on the day of the court's order. Further, because the Heitzmann trial was in recess, it would have been impractical to try to reassemble the Heitzmann jurors and admonish them about exposure to information from the Allen trial. But if that were a realistic concern, the Heitzmann court presumably would have admonished them

---

[7] Certainly, if the court was concerned that *jurors* in the Allen trial might inadvertently reveal the name of the prosecutor in that matter to jurors in the Heitzmann trial they might encounter in the courthouse, the court could have admonished them to have no communications regarding the case, including discussions identifying any prosecution or defense counsel. The Allen court also could have admonished its jurors to avoid media coverage of the Heitzmann trial (or perhaps any superior court trials) during their service in the Allen trial to reduce the possibility they would find out that their prosecutor was a victim in the stalking trial and inadvertently mention that to the jurors in that trial.

[8] Of course, absent (and perhaps in spite of) such restrictions, jurors in the Heitzmann trial might have learned the victim in their case was a capital prosecutor before the Allen court's November 6 order. Whether any jurors already had that information, and if so, whether it affected their deliberations in any way, is on this record mere speculation.

about that issue at the outset of their jury service. Nevertheless, the court here should have considered such a restrictive measure, and perhaps other measures, including simply contacting the judge in the Heitzmann trial to determine what restrictive measures were already in place and whether other measures were needed, before resorting to a prior restraint.

¶19 Third, how effectively would the prior restraint operate to prevent the threatened harm? We agree with Petitioners that, because of the widely disseminated previous reporting on the Allen case and readily available public records, the court's order likely had no real effect except to temporarily limit the media in reporting on the trial. The prosecutor's name had already been associated with the Allen case in numerous media accounts and public records, including the court's own publicly available minute entries. *See Okla. Publ'g Co. v. Dist. Court ex rel. Okla. Cty.*, 430 U.S. 308, 311 (1977) (invalidating a court order prohibiting the dissemination of a juvenile defendant's name and photograph where that information was obtained during an open court proceeding); *In re Charlotte Observer (A Div. of Knight Publ'g Co. & Herald Publ'g Co.)*, 921 F.2d 47, 49 (4th Cir. 1990) (invalidating a restriction on the publication of an attorney's name where it was "revealed in open court"); *Phoenix Newspapers*, 156 F.3d at 949 ("Indeed, if a document becomes part of the public record, the public has access to it, and the press may report its contents." (citing *The Florida Star v. B.J.F.*, 491 U.S. 524, 538 (1989))). Although the court's order may have operated to temporarily prevent any perceived harm related to the Heitzmann trial, it was likely unnecessary and ineffective, and it infringed the media's right to truthfully disseminate public judicial records that already identified the prosecutor.

¶20 Because the court's November 6 order does not pass the three-part test announced in *Nebraska Press Ass'n* and adopted in *KPNX Broadcasting Co.*, the order constitutes an impermissible prior restraint on the media's constitutional right to cover the Allen trial. *See* U.S. Const. amend. I; *see also* Ariz. Const. art. 2, § 6.

### III. The Remedy

¶21 In their memoranda, Petitioners asked this court to enter an order requiring that if the superior court intends to impose any other restrictions on the media in this case, it must utilize the least-restrictive means available. By seeking prospective relief, Petitioners in effect asked us to issue an advisory opinion restraining a theoretical future ruling of the superior court. This we decline to do.

¶22 At oral argument, however, Petitioners appeared to modify their position by stating they were simply seeking a declaration that the superior court's ruling constituted an impermissible prior restraint on the media's right to cover the Allen trial. Because the issue presented here—a prior restraint imposed in the middle of a jury trial—is an issue capable of repetition but evading review, we accept jurisdiction and grant this portion of the relief Petitioners have requested. Before imposing a prior restraint on the media, a superior court should fully apply the three-part inquiry set forth in *Nebraska Press Ass'n* and memorialize its findings, including its weighing of the rights of the defendant(s), the press, and any victims, *see* U.S. Const. amend. I, VI, XIV; Ariz. Const. art. 2, §§ 2.1(A)(10), 6, 24, and its consideration of any less restrictive alternatives that might effectively prevent any threatened harm.

**CONCLUSION**

¶23 Accordingly, we accept special action jurisdiction and grant in part the limited relief requested by Petitioners.

